The City of Chicago

*v.*

The Norton Milling Company.

*Opinion filed April 16, 1902—Rehearing denied June 6, 1902.*

1. Municipal corporations—*city has power to acquire land for bridge purposes.* A city organized under the general law has power to construct bridges, to deepen, widen or change the channels of water-courses, to erect docks and keep them in repair, and to acquire, by purchase, lease or gift, not to exceed four acres of land for bridge purposes.

2. Same—*right of city to contract for easement of right to swing bridge over property.* A city has power, in connection with the widening of a river and the building of a new bridge, to acquire an easement consisting of the right to swing the bridge over ground owned by a milling company, and may agree, in consideration of such easement, which will necessitate the removal of the milling company's boiler rooms, to excavate a vault under the street for its use as a boiler room, rent free, and to rebuild the milling company's dock upon the new line of the river bank, and indemnify the company against damages from the city's tortious acts.

3. Same—*effect where lawful contract by city is irregularly made.* If a contract is within the power of a municipal corporation but is executed by officers not having authority to make it, the contract may be ratified by the city, and the city may be estopped to deny the validity of its acts in that respect.

4. Same—*when expense of work may be paid from bridge appropriation.* The expense of carrying out a contract made by a city to acquire an easement of the right to swing a new bridge, about to be constructed, over private property not condemned, may properly be paid out of the appropriation for the cost of the bridge, the whole work being necessitated by the construction of such bridge.

5. Same—*city officers presumed to act for best interests of the city.* In the absence of proof to the contrary, it will be presumed that the action of the corporation counsel in dismissing a condemnation petition for bridge extension as to a portion of the property, and

of the mayor and commissioner of public works in executing a contract to acquire an easement of the right to swing the bridge over the property not condemned, was for the city's interest.

6. Same—*whether city ratified contract is a question of fact.* In an action at law on a contract executed by officers of the city having no authority, the question whether the city ratified the contract is one of fact, upon which the judgment of the Appellate Court is conclusive.

Magruder, J., does not concur.

*City of Chicago* v. *Norton Milling Co.* 97 Ill. App. 651, affirmed.

Appeal from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. John Gibbons, Judge, presiding.

The appellee, the Norton Milling Company, on April 28, 1892, brought this suit against the appellant, the city of Chicago, to recover damages under a certain contract alleged to have been made between it and the city. The appellant filed a plea of general issue October 24, 1894. Afterwards, in 1898, it filed additional pleas, that no appropriation had been made, at the time of making the supposed contract, for the payment of money promised to be paid, as alleged in the declaration, and set-off for rent. And again, in 1900, it filed plea of general issue sworn to, and plea of entire want of consideration. The trial was held in July, 1900, and judgment was rendered on a verdict of $11,879 damages in favor of appellee. This judgment was affirmed by the Appellate Court.

In 1887 the city council of the city of Chicago directed its law department to report what action had been taken relative to the condemnation of property on the west side of the river, at Madison street, for the purpose of a double roadway bridge. Subsequently, in March, 1889, the city council passed an ordinance for widening the south branch of the Chicago river north of and adjoining West Madison street, directing a certain triangular strip to be condemned for that purpose. Shortly afterward there was an appropriation made of $200,000 for the con-

struction of a new bridge at Madison street. Thereupon, on April 6, 1889, the city filed its petition for condemnation in the superior court. The property sought to be condemned lay between the mill of appellee and the west bank of the river, beginning at a point on the dock twelve feet east of the south-east corner of the mill and running thence west to within two feet of this corner, thence north-easterly about seventy feet to a point on the dock, thence south to the place of beginning, thus making a triangular piece. April 13, 1889, the corporation counsel dismissed the petition as to the west three and a half feet of the tract proposed to be taken, and the case was submitted to the court without a jury, and the court assessed the compensation for the property sought to be taken and damaged at $10,290, which amount was paid by the city. On the same day the contract which is made the foundation of this suit was entered into between appellee and appellant, and signed on behalf of appellant by John A. Roche, mayor, and George B. Swift, commissioner of public works. This contract, after reciting the condemnation proceedings, is as follows:

"Whereas, the said widening of the river is intended by said city to be done in connection with the construction of a new double bridge at Madison street, and in part for the purpose of enabling the said city properly to construct and operate said bridge; and whereas, said city desires to acquire the right to swing said bridge, when constructed, over a portion of said lot nine (9) lying between said mill building and said river, and not condemned or to be taken for the purpose of widening said river, as aforesaid, and the granting of such right or easement by said party of the first part, and the use and enjoyment thereof by said party of the second part, will necessitate certain changes in the engine room, located in the south-east corner of said mill building, and the removal of the boilers of said party of the first part from their present location at the south-east corner of said

building, whereby said party of the first part will be subjected to great expense, and will also be exposed to great loss and inconvenience by and through the interruption to its business resulting therefrom.

"Now, therefore, in consideration of such right or easement, as hereinafter granted by said party of the first part, and of the expense and loss to be borne by said party of the first part by reason thereof, as aforesaid, said party of the second part hereby agrees that before taking possession of the strip of land condemned, as aforesaid, or disturbing said party of the first part in the occupation of said premises or of its boiler room as now located, it will excavate the north half of that portion of Madison street extending from the Chicago river to West Water street to the level of said boiler room as now occupied, and will enclose by proper walls the space so made, and will and does hereby give the use of the same to said party of the first part, its successors and assigns, free of rent, for so long a term as said party of the second part has or may hereafter acquire power to give or grant the use thereof, for the use of said party of the first part, its successors and assigns, as a boiler room and for the storage of coal in connection with said mill building or other buildings which may hereafter be erected on said property and used for manufacturing purposes or requiring steam power for any purpose; and that it, said party of the second part, will also, and hereby does, agree to protect and indemnify said party of the first part, its successors and assigns, from and against all damages to said building, or the contents thereof, which may result from the change of dock line or the operations of said party of the second part, its agents, contractors or employees, in the construction of a new dock, and that such new dock, when constructed, shall be similar and equal in character and construction to the present dock, and also that in constructing the same it will provide, by driving piles or otherwise, suitable and adequate pro-

tection from vessels, satisfactory to said party of the first part, for the fly wheel of the engine, now projected through the east wall of said mill building.  And said party of the first part, in consideration of the agreements aforesaid to be performed by said party of the second, part, and for so long a period as the use of said space under Madison street shall be permitted and secured to it, its successors and assigns, as aforesaid, does hereby give and grant unto said party of the second part the right to swing said new bridge, or any bridge built to re-place the same, over the south-east corner of said lot nine (9), on a circle so drawn that said bridge, in swinging thereon, shall not at any point pass said building, or any building to be erected having the same east line, at a distance of less than two feet."

On the same day the city made two contracts for the erection of the bridge, but nothing is said in either of these contracts about the re-construction of the dock or the making of the vault for the use of appellee.  The new bridge was begun in the spring of 1891 and opened for traffic October 16, 1891.  The old abutment and dock were removed and a new dock put in about five feet west of the old one, and the space in Madison street was dredged out about eighteen feet west of the former line.  After this work was done, cracks appeared in the wall of the mill building, and the building settled about six inches at the south-east corner.  The shafting got out of line and had to be lined up repeatedly.  The engine bed also settled.  Appellee claimed that this was due to the unskillful way in which the work of re-constructing the dock was done.  Appellant claimed that it was not due to this cause, but to the overloading of the foundations with additional stories and the general overloading of the building with heavy machinery.  Rods were put in the dock and anchored to the building by direction of the city engineer, and more rods were put in afterwards by appellee to strengthen the mill building.

Charles M. Walker, Corporation Counsel, and Thos. J. Sutherland, for appellant.

Francis M. Walker, and Byron Boyden, for appellee.

Mr. Justice Carter delivered the opinion of the court:

The admission of the contract in evidence is assigned as error. It is contended that the city officials who signed the contract had no authority to do so on behalf of the city; that it is void because no previous appropriation was made to pay the obligation of the city created by it, and because it arose out of the illegal act of the corporation counsel in dismissing the petition as to part of the land sought to be condemned; that it is not mutual; that the city had no right to acquire any interest in land except by condemnation; that there was no consideration to support the contract, and that the portion granting the use of the street to appellee is void for lack of power in the city to make such a grant. On behalf of appellee it is contended that the most that can be alleged against the validity of the contract is, that it was entered into in an unauthorized manner. It is contended, however, that it has been fully executed and that the city has received the benefit of it, and that the city, by its acts and by its acquiescence, ratified the act of its mayor and commissioner of public works and is estopped to deny its validity.

The city had power to construct bridges; to deepen, widen, dock, alter or change the channels of water courses; to erect and keep in repair, regulate and control docks. (Rev. Stat. 1874, chap. 24, par. 62.) It also had the power to acquire, by purchase, lease or gift, not to exceed four acres of land for bridge purposes. (Laws of 1877, p. 61; Starr & Cur. Stat. chap. 24, par. 284.) The city, instead of acquiring all the land at first sought to

be condemned, which would have brought its property to within two feet of the Norton mill, took a smaller portion. This necessitated acquiring the right to swing the end of the new Madison street bridge over a portion of appellee's premises. Its officers then entered into a contract with appellee by which the city acquired this right, and in consideration therefor agreed to construct the vault under Madison street and give the use of it, rent free, to appellee for as long a time as it had power to do so. It is also recited in this part of the contract that the use and enjoyment of the easement of swinging its bridge over this part of appellee's premises would necessitate certain changes in the engine room and the removal of the boilers from their then location at the south-east corner of the building, and thereby subject appellee to great expense, and to great loss and inconvenience through the interruption of its business resulting therefrom, and this expense and loss are made part of the consideration for the contract. Whether this arrangement,—that is, the taking of about half the land originally contemplated to be taken and the building of this vault for appellee for the privilege of swinging the bridge over its premises,—was more or less advantageous to the city than the condemnation of the whole strip would have been does not appear. The facts show that the whole strip was not needed for the purpose of widening the river sufficiently for the new bridge. That the city might make such an arrangement or compromise, when sanctioned by the city council, is undoubted. The city having power to do so, the act of its officers in making this contract was not *ultra vires* the corporation and illegal, but only beyond the authority delegated to the officers, and could be ratified by the city, and the city might be estopped to deny the validity of their acts. (*Town of Bruce* v. *Dickey*, 116 Ill. 527; *Barnard & Co.* v. *County of Sangamon*, 190 id. 116.) In so far as this part of the contract is concerned, it was mutual and founded on a legal con-

sideration. The lease of the vault under Madison street was not illegal, such leases having been upheld in *Gregsten* v. *City of Chicago*, 145 Ill. 451, and under the contract the city was not entitled to recover any rent therefor. Nor does this conflict with what is said in *Hibbard* v. *City of Chicago*, 173 Ill. 91. In that case an awning had been erected, which the court held was an unlawful obstruction in the street. The vault spoken of was beneath the street and not an obstruction of any kind, and the city is not estopped by the contract from reclaiming this space whenever necessary for the uses of the public.

We think the facts show that the city ratified the contract with full knowledge. The contract was executed in duplicate in 1889, and a copy of it was presumably filed in the appropriate public office. The work that was done under it was done by a succeeding administration. The work of re-building the dock and constructing the vault under Madison street was done by and under the direction of the city and paid for by the city. The bridge was opened for traffic in 1891, and has been used and swung over the premises of appellee ever since. It is true, this suit was begun in 1892,—only six months after the opening of the bridge; but no plea attacking the contract was filed till 1898, nor was any act shown by the city disaffirming or ignoring the contract. It was fully executed. As was observed before, it does not appear whether the action of the corporation counsel in the premises was more beneficial to the city than the condemnation of the whole strip, as directed by the city council, would have been, but in the absence of any testimony to the contrary we must presume that the counsel, mayor and commissioner of public works acted for the best interests of the city in what they did. That the conduct of a suit is largely within the control of the attorneys needs no demonstration. But at all events, whether the city ratified the contract or not was a question finally settled in the Appellate Court.

The objection that the contract is void because there was no previous appropriation to pay for the expense incurred under it is of no force.   It does not appear from what appropriation the cost of the new dock or of the building of the vault was paid for, nor even what they cost.   The whole work being necessitated by the building of the new bridge, it would have been proper to have paid for the same out of the appropriation which was made for the bridge.   But by the contract the city also agreed to protect and indemnify the appellee from and against all damages to its building, or the contents thereof, which might result from the change of the dock line, or the operations of the city, its agents, contractors or employees, in the construction of the new dock.   That the city would have been liable to appellee in an action on the case for doing this work in an unskillful manner, by which appellee would have been damaged, is settled. (*City of Chicago* v. *Seben,* 165 Ill. 371, and cases cited.)   It was its duty, before entering upon the proposed work of widening the river and constructing the bridge at this point, to take into consideration the situation of appellee's mill and the danger to which it would be exposed by the making of these improvements.   In so far as the city, by its contract, undertakes to indemnify the appellee for its tortious acts, we see no reason why such contract should not be binding upon it.   No damages are sought to be recovered in this action for anything but the results of the unskillful manner in which it was claimed this work was done.

It is strenuously insisted that evidence was admitted which was not competent under the averments of the declaration and the terms of the contract.   The declaration counts on damages caused by the operation of the city, its agents, contractors and employees, in making a change of the dock line and in the construction of a new dock.   Evidence was admitted as to the effect upon appellee's mill of the work done at the center pier of the

bridge and in dredging out the river, and in and about the taking out of the old abutment and of the dredging and piling done in respect to the same. All of the work done was made necessary by the building of the new bridge. The condemnation proceedings were instituted for the purpose of acquiring sufficient land for widening the river and for building the new bridge. The subsequent agreement with appellee was a part of the proceedings necessary for the work contemplated. The construction of the new dock and of the vault under Madison street thereby became part of the work necessary to the widening of the river and building of the new bridge. That the city contemplated doing this work is recited in one of the preambles of the contract. The change of the dock line and construction of a new dock were thus parts of the whole improvement undertaken by the city, and were so intimately connected and related that it behooved the city officials in charge of the work to take into consideration the inter-relation of the several parts of the work, and to be guided in their manner of doing each part by the effect it would have on the other parts of the entire work. Whether the pulling out of the piles under the old center pier of the bridge and the dredging of the river at that point would or did have any effect on the work on the new dock or on appellee's mill was strongly contested at the trial, the witnesses testifying to diametrically opposite opinions. Likewise as to the effect of pulling out the piles under the old abutment, the dredging back of Madison street for about eighteen feet and the putting in of new piles. As all of this work was done practically at about the same time that the new dock was constructed, it was a proper subject of inquiry.

There was no error in allowing evidence to be given of what was done by the city engineer to strengthen the building when his attention was called to the fact that its walls were beginning to crack. It only showed, at

most, that in the opinion of the city engineer something ought to be done to prevent further damage to the mill.

Objections are made to the hypothetical questions asked the various experts as to the cause of the settling of appellee's mill building, on the ground they did not state the facts fully. We think these questions stated the facts fairly, and the appellant, on cross-examination, drew from these experts the reasons on which they based their opinions, thus enabling the jury to judge how much weight to give to them.

We have carefully examined the instructions given and refused by the court and find no error in the rulings of the court thereon. Most of the refused instructions asked by appellant were based on its theory that the contract was illegal and invalid. They were properly refused. Appellant's theory that the evidence showed that the damage to appellee's building was due to internal causes was fully presented by the instructions given.

Special objection is urged as to the court's modification of the appellant's nineteenth instruction. While this modification is perhaps open to the objection urged against it, it could have done appellant no harm, as the evidence showed that appellee did not rely on the fact that the engineer had had some rods put in to strengthen the mill, but continued to and did put in more rods itself to strengthen the building.

There are other objections made to the evidence and to other points, which we have considered, but do not think it necessary to go over them in detail. They were properly disposed of by the Appellate Court.

The judgment will be affirmed.

*Judgment affirmed.*

Mr. Justice Magruder does not concur.