Argued October 25, 1929; affirmed February 4; rehearing denied May 27, 1930

## ASHER v. CITY OF PORTLAND
(284 P. 586)

42

*Frank S. Grant*, City Attorney, and R. A. *Imlay*, Deputy City Attorney, both of Portland, for appellant.

*William P. Lord* of Portland (Lord & Moulton of Portland on the briefs) for respondent.

McBRIDE, J. A careful examination of the testimony indicates that there was sufficient evidence to have sustained a verdict for plaintiff had defendant been a private corporation; the principal contention here urged being based upon the fact that defendant is a municipal corporation and the assumption that plaintiff's position as a lineman attached to the fire department for certain purposes rendered him an officer of the municipality instead of an employee, and that therefore, he is not within the purview of the Employers' Liability act. There is a further contention that the task in which he was then employed was governmental in its character, and that for such reason the city is not liable for the injury which he sustained.

Taking up the contentions inversely, we will now consider the question as to whether the city was acting in its governmental capacity in the work in which plaintiff was engaged at the time of the accident. The testimony is somewhat scanty, but it appears that the city was engaged in the work of clearing obstructions to the approaches of a bridge across the Willamette river at Ross island within the city limits. Whether the bridge was being constructed, or had been constructed, by the city, or by the county, or by both the city and county does not appear from the testimony. It does appear from the testimony that among the obstructions to the approaches to said bridge was an old and then unused line of telephone poles with wires attached, which had at one time been used by the city as an adjunct to its fire alarm service. The plaintiff and two other linemen were assigned to the labor of taking down these poles and wires which were a part of the obstructions. One Ambrose, who was a regularly selected and appointed lineman and who was the foreman in charge, directed plaintiff to climb one of the poles and take down the cross-arms and wires attached thereto preparatory to taking down the pole. The foreman assured plaintiff that he had tested the pole and found it safe; in fact, the pole was completely rotten at the base, which condition an adequate test would have disclosed. When the plaintiff, relying upon the assurance of the foreman that the pole had been tested, climbed it and was engaged in the labor of removing the cross-arms and wires, it broke at the base and he was injured. The foregoing is a brief sketch of plaintiff's testimony and only intended to show the nature of the work he was engaged in. As before noted, the evidence, as to what part of the work

the city was conducting, is very meager, consisting practically of the following testimony of plaintiff:

"Q. What were you doing this time you were hurt? Give the jury an idea what the work was that was going on.

"A. They were building that approach to the west end of the Ross Island bridge; we were moving all of that stuff out of there so as to make room for it, and they were in a hurry to get that out of there on account the contractors was up with the work, waiting on us.

"Q. How long had you been on the job taking wires out and clearing for the Ross Island bridge?

"A. Well, this particular time we went up there that morning, this particular day.

"Q. How long had you been working around that bridge?

"A. Oh, we worked there on and off for quite a little while; we had to change all our wires, re-route them, string new wires, but we hadn't worked at it steady.

"Q. What were those wires used as you were working with?

"A. The signal system, fire alarm systems in the houses.

"Q. What were you trying to do with them at the time you were hurt?

"A. Getting them out of the way to take the poles down.

"Q. When you got them out of the way, what were you going to do with them next?

"A. They were going to be taken out of that particular location altogether.

"Q. Were you going to put up anything else, in their place?

"A. No, not that time; they had built it around another loop.

"Q. Had you already built the other route?

"A. Yes sir, working the other way. The stuff wasn't working at that time."

■ There being no presumption as to what capacity the city was conducting or causing to be conducted the work, we think that, under the circumstances alleged, it is fair to assume that it was acting in its corporate or proprietary capacity instead of its governmental capacity, if indeed the capacity in which it was acting makes any difference when considering the provisions of the Employers' Liability act as it existed at the time when this injury occurred, which matter will be discussed later.

In the case of *Giaconi v. City of Astoria*, 60 Or. 12, 113 P. 855, 118 P. 180, 37 L. R. A. (N. S.) 1150, which was brought against the city for negligence in the planning and execution of an undertaking for street improvement in the city of Astoria, the primary opinion was rendered by Justice MOORE, who, while reversing the judgment for plaintiff on other grounds, defined its liability for negligence in the execution of the work as follows:

"A municipal corporation in devising plans for improving public highways within its borders acts judicially, and when proceeding in good faith is not liable for errors of judgment; but in constructing the work it acts ministerially, and is bound to see that the plan is executed in a reasonably safe and skillful manner. *Goddard v. Inhabitants of Harpswell,* 84 Me. 499, (24 Atl. 958, 30 Am. St. Rep. 373, 379); *Chicago v. Norton Milling Co.,* 196 Ill. 580, (63 N. E. 1043); *Lansing v. Toolan,* 37 Mich. 152; *Defer v. Detroit,* 67 Mich. 346 (34 N. W. 680); *McDonald v. Duluth,* 93 Minn. 206 (100 N. W. 1102); *Watters v. Omaha,* 76 Neb. 855 (107 N. W. 1007; 110 N. W. 981, 14 Ann. Cas. 750)."

The matter came up for rehearing, and Justice BURNETT speaking for the majority of the court, among other things, said:

"The principal contention for the defendant is that, within the meaning of *Brand v. Multnomah County,* 38

Or. 79 (60 Pac. 390; 62 Pac. 209; 50 L. R. A. 389; 84 Am. St. Rep. 772), and other like precedents, the grievances of which the plaintiff complains were consequential injuries resulting from the exercise of the city's governmental function of improving its streets. Herein is involved the distinction between the legislative and administrative powers of the city. The issue in this aspect of the case is whether the city acted wholly within its sphere as a governmental agent, wherein it is immune in respect to mere errors of judgment, or whether what it did was in its ministerial capacity, to which the consequences of negligence and maladministration will attach. In the leading case of *Perry v. Worcester,* 6 Gray (Mass.) 544, 547, (66 Am. Dec. 431), the court, speaking by Chief Justice Shaw, lays down the rule that the exercise of the governmental function exonerates a municipality from liability for such damages as necessarily results from the act. 'But,' says the learned judge, 'this presupposes that the public work thus authorized will be executed in a reasonably proper and skillful manner, with a just regard to private owners of estate. If done otherwise, the damage is not necessarily incident to the accomplishment of the public object, but to the improper and unskillful manner of doing it. Such damage to private property is not warranted by the authority under color of which it is done, and is not justifiable by it. It is unlawful, and wrong, for the redress of which an action of tort will lie.'

"In *Rochester White Lead Co. v. Rochester,* 3 N. Y. 463 (53 Am. Dec. 316), the court holds that the ordinance of the common council directing a public improvement is judicial in its nature, and extends immunity from private action for damages to those who perform the duty; but there this immunity ends. The further prosecution of the work is purely of a ministerial character, and the city is bound to see that it is done in a safe and skillful manner. *Aschoff v. Evansville,* 34 Ind. App. 25 (72 N. E. 279) teaches that a municipal corporation is liable for the negligent dis-

charge of ministerial duties arising by necessary impli-
cation, even in connection with governmental func-
tions.''

This decision, as is indicated by the two opinions,
was not reached without controversy, but both Justice
MOORE, who wrote the first opinion, and Justice BUR-
NETT, who wrote the second opinion, agreed in the dis-
tinction between the governmental and ministerial
functions of a municipality. Applying the doctrine
thus enunciated by these eminent jurists to the case at
bar, we find that the city had a plan or purpose to
remove certain poles that obstructed a proposed
approach to a bridge on which the city had some inter-
est. Taking down the pole had little if any more rela-
tion to his duties as a fireman, if indeed he was a fire-
man, than clearing the brush out of a proposed street,
or cutting down a tree that might be in the way of the
proposed improvement. In either case, it would be
doing work which the city was carrying on minis-
terially, and not governmentally, unless we should
overrule the case before cited, which we do not feel
inclined to do.

Another objection urged by appellant is that the
plaintiff by virtue of being a lineman (a branch of the
city service attached to the fire department of Port-
land) is an officer of the city and, therefore, not within
the purview of the Employers' Liability act, the theory
being that if he was an ''officer'' he could not at the
same time be an ''employee'' of defendant. It has been
held that a regular fireman is, with relation to some
statutes, an officer, but we are not aware of any statute
relating to the Employers' Liability act, which pre-
vents an employee, whose duty and occupation is in the
main purely mechanical, from claiming the benefits of
the Employers' Liability act by reason of his having

taken an oath to support the constitution of this state and the constitution of the United States, and to faithfully perform his duties. Such a distinction is certainly not made in the act itself, the title of which is as follows:

"A bill to propose by initiative petition a law providing for the protection and safety of persons engaged in the construction, repairing, alteration, or other work, upon buildings, bridges, viaducts, tanks, stacks and other structures, or engaged in any work or upon or about electrical wires, on conductors on poles, or supports, or other electrical appliances or contrivances carrying a dangerous current of electricity; or about any machinery or in any dangerous occupation, and extending and defining the liability of employers in any or all acts of negligence, or for injury or death of their employees, and defining who are the agents of the employers, and declaring what shall not be a defense in actions by employees against employers, and prescribing a penalty for a violation of the law."

■ The plaintiff was certainly a "person" engaged in work in a "dangerous occupation" and is certainly within the letter and spirit of the title, whether he was a pseudo officer or not. Further, section 1 requires precautions to be taken by "all owners, contractors, sub-contractors, *corporations* or persons whatsoever." Still plaintiff is within his rights. The word "corporation" is not qualified or used in a restricted sense and includes municipal corporation. *Mackay v. Commission of the Port of Toledo,* 77 Or. 611, 152 P. 250. It was never the intenton of, nor was it in the mind of, the framers of the city charter of Portland to divest persons, in its employ by reason of selection, of the character of employees by civil service board.

Thus, in section 108 of the Charter and Charter Ordinances of the City of Portland, Oregon, we find

this language: "No *employee* in the classified civil service, who shall have been permanently appointed under the provisions of this article, shall be removed or discharged except for cause," et cetera, which is a clear recognition of the statutes of persons so selected as employees.

Again, in section 10, of the charter, under the title "Hold-Over Employees," we find this language: "The present incumbents of all offices, places and employments under the civil service rules, shall continue to hold their respective places," et cetera, and again in section 117 of the charter we find this language:

"The phrase 'public officer' shall be held to include all public officials within this city, whether paid directly or indirectly from the public treasury of the state or of the United States, or from that of any civil division thereof, including counties, cities and towns and whether by fees or otherwise; and the phrase 'public employes' shall be held to include every person not being an officer who is paid from any said treasury."

See also section 56, Charter Ordinances, which provides that the council may authorize the appointment of a chief engineer of the fire department and "as many officers and employees as in its opinion are necessary." See also section 58, Charter Ordinances, which is as follows:

"Oath of Members of Bureau of Fire: All officers and *members* of the Bureau of Fire serving on full time and devoting their labor exclusively to the interests of the city, before entering upon their duties, shall take an oath before the auditor, similar in tenor and effect to that required of city officers, which oath shall be subscribed by the person taking it and shall be filed and preserved in the office of said auditor."

Here is a clear distinction between "officers" and "members" of the fire department. The same distinc-

tion is preserved in section 59, Charter Ordinances, all indicating that there may be "officers," "members" and "employees" in the fire department.

From a perusal of the charter, we take it that the duties of the civil board are, in the main, intended to apply to a municipality the same, or perhaps in some instances greater care in the selection of persons applying for places of employment, as the city service. Its function in a great measure was to select, as a private employer would do, from a multitude of applicants those most capable of performing the duties of policemen, firemen, mechanics, garbage collectors and whatnot, not in the language of the "Declaration of Independence," to erect a multitude of new offices. Of course, if the duties of the position were such as to give dignity or authority to the person selected, or if the position was already regarded as official, such dignity and power continued to accompany the appointment. Such is the case of a police officer, which has been regarded as, in fact, an office from a remote period, so that in addressing a strange policeman one usually addresses him as "officer" and, because of the comparative dignity and responsibility of his position and his authority to make arrests, and his investment by the statute of certain authority, he is a legal officer and entitled to that dignity.

■ The duties of a fireman, while they invest the person, performing them, with serious responsibilities in some respects, perhaps sufficiently to make him as respects his relations to the public, at least a quasi-officer to the extent that his acts, when negligent, will not bind the city when acting in its governmental capacity, do not necessarily take away from him his character as an employee. The blacksmith, when selected by rea-

son of his mechanical skill to shoe the horses used in the fire department, is still a blacksmith, but, the maintenance of the fire department being governmental, the city is not liable for injuries received by him while engaged in that duty as it has been so held, and, being material here, the writer reluctantly assents so far as the discussion here extends. While it may be admitted that, so far as his relations with the public are concerned, a fireman may be termed *sub modo* an officer, having certain duties to perform, it does not follow that he is, therefore, such an officer as to be excluded from the benefits of the Employers' Liability act.

In *Albee v. Weinberger,* 69 Or. 331, 138 P. 859, we have a case involving a statute prescribing that no person employed by the state should be required to labor more than eight hours a day, with certain exceptions. The decision seems to turn upon a construction of the words "labor" and "laborer," and upon a stipulation as to the requirements of the city charter, which stipulation omits some of the particulars which are alluded to in the present discussion. It was held that as to firemen their labor was not necessarily continuous for eight hours, and, therefore, they were not within the terms of the act. It was further held that a fireman or policeman, not being subject to removal or dismissal at the whim of the appointing power, were "officers" and not "laborers" within the meaning of the act then being considered. The court laid some stress on the fact that the persons aggrieved had been required by the ordinance to take an oath, and had done so, and quoted with apparent approval the case of *Collins v. Mayor,* 3 Hun. (N. Y.) 680, wherein it is intimated that the true test of whether a person employed by the city is an officer is the taking of an oath, which, incidentally

we may remark, was not done by the plaintiff in the case at bar. While the case of *Collins v. Mayor,* supra, met with a limited approval, and, while the fact of a person, designated for a position or place, takes an oath, is one of the tests whether or not he is an officer, it is far from being conclusive. Every soldier, who enlists in the United States, takes an oath quite as strenuous as that prescribed by the city ordinances of Portland, but we opine that, if he presented himself at the officers' mess asserting that his oath made him an officer, he would discover that after all he was still a private. So far as we are informed, every employee selected by the civil service board of Portland, from the chief of police down perhaps to the humble laborer who shovels manure into a garbage cart or piles it upon the street, takes an oath. Are all these persons officers simply for that reason, or, if officers in a peculiar and restricted sense, are they not in the broader sense also employees or workmen? We think that they may be both. It is not a question here, as to whether plaintiff was or was not an officer or quasi-officer in a technical sense. Upon that question some authorities hold that, in some instances and in relation to some statutes, he may be deemed to be an officer, and Oregon is to be classed among that number to a limited extent. *Albee v. Weinberger,* 69 Or. 331, 138 P. 859, and *Johnston v. Grants Pass,* 120 Or. 364, 251 P. 713, 252 R. 1118.

On the other hand, *The People v. Pinckney et al.,* 32 N. Y. 377, and *State v. Jennings,* 57 Ohio St. 415, 49 N. E. 404, 63 Am. St. Rep. 723, appear to hold a contrary doctrine. Of course, we follow our own decisions so far as applicable here, and hold that regularly selected firemen, acting in pursuance of their duties as firemen, are to a certain extent officers, or, at least,

quasi-officers. *Johnston v. Grants Pass,* supra, is the last expression of this court on that subject. That case was an action against the city by reason of the negligent act of a fireman in setting out a fire upon some lots overgrown with grass, which fire seems to have run out of limits and injured plaintiff's property. The action was an ordinary action for damages, there being no element of the Employers' Liability act in the case. This court, speaking through Justice COSHOW, among other things, said:

"The difference between governmental and ministerial powers exercised by a municipality is clearly distinguished in an opinion by Mr. Justice Burnett in *Giaconi v. City of Astoria,* 60 Or. 12, 34, 113 Pac. 855, 118 Pac. 180, 37 L. R. A. (N. S.) 1150. See also, *Humphrey v. Portland,* 79 Or. 430, 433, (154 Pac. 897).

" 'It will thus be seen that on general principles it is necessary, in order to make municipal corporation impliedly liable on the maxim of respondeat superior for the wrongful acts or negligence of an officer, that it be shown that the officer was its officer either generally or as respects the particular wrong complained of and not an independent public officer; and also that the wrong was done by such officer while in the legitimate exercise of some duty of a corporate nature which was devolved on him by law or by the direction or authority of the corporation. 2 Dillon, Munic. Corp., § 974, [*Caspary v. City of Portland,*] 19 Or. 496, 501.'

"The fire which caused the damage was set, it is claimed, by a fireman of the city. As appears from the excerpts set out above from the ordinance of the defendant city, the fireman had no authority to burn the grass.

\*   \*   \*   \*   \*

"Plaintiff has contented himself by citing cases only where the city was involved in his corporate or proprietary capacity. As clearly shown by the authorities above cited there is a wide distinction between

the liability of a city in its corporate and governmental capacities. It is not necessary for us to determine in this case whether or not the city would have been liable had the council directly ordered the fire to have been set as it was. Whether the fireman was acting strictly within his official duties in setting the fire or exceeded his authority under the ordinance is immaterial for in either case the city is not liable for his acts. He is a public officer representing the public and is not an agent or officer of the city in its corporate capacity.''

Passing on a petition for rehearing, the court, among other things, said:

''It is claimed that the fire was set out on unoccupied lots without any request from the owners. The ordinance prescribes that the superintendent of streets shall burn grass, unless the owner of the land burns the same in accordance with the ordinance referred to in the former opinion. We have carefully re-examined the record. The record clearly discloses that the fireman who started the fire was sent to the place of fire in his capacity as a fireman, in accordance with the ordinance with a permit to the owner of adjoining premises to burn the grass on her premises. There is no evidence at all that any attempt was made by the superintendent of streets to burn the grass in accordance with the ordinance. The question of the liability of the city for any neglect exercised by the superintendent of streets when acting under the ordinance is not presented by this appeal or by the case. The city is no more liable for the act of the fireman in starting the fire without authority than it would be if a transient or some children started the fire. Accepting the verdict of the jury as conclusive that the fire was started by the fireman, we are constrained to adhere to our former opinion, because his act was entirely unauthorized and no attempt was made by him or any other officer of the city to comply with the ordinance directing the burning to be done by the superintendent of streets. All of his conduct was ostensibly under

authority of the permit issued to the owner of the adjoining premises. The fireman personally might be liable for his unauthorized act, but the city can not be held liable under the circumstances of the facts disclosed by this proceeding.''

We include excerpts from the opinion, because they clearly distinguish it from the case at bar. In the Johnston case the action was clearly at common law. Here the action is upon a statute, whose terms, fairly construed, include an employee of a municipal corporation. There the city was not engaged, either in its governmental or proprietary capacity, in any enterprise. The act done by the fireman was not within the purview of any work authorized by the city. His duty was to prevent fires and to protect from the consequences of the fires and not to kindle them. While *sub modo* he was an officer of the city for the purpose of protecting its citizens from fire, he had no authority, in any capacity, to start a fire. His act in kindling a fire was that of a volunteer, wholly without authority, for which the city was in no way liable, and for which the city was no more responsible than it would have been if he had stolen a horse. Here the city was engaged in its proprietary capacity in the wholly ministerial work of removing its old junk to make room for the approaches to a bridge, which it is not shown it was even engaged in building. It had sent plaintiff, under the supervision of its foreman, to assist in this ministerial or proprietary work. For the purposes connected with the job, the foreman was, or represented, the city. He neglected his duty to properly test the poles and plaintiff was injured. The employment was hazardous, and there was neglect by the city to protect plaintiff from these hazards. Why it should not be liable in such a case, and yet liable if, through

the negligence of the street superintendent, a citizen stepped into a hole improperly left in the sidewalk, passes understanding, but the present is a stronger case, because here we have the Employers' Liability act to reinforce the common law liability. If a policeman, hurrying to overtake a criminal, had fallen into a hole in the street, negligently left unlighted by the street authorities, it would be considered a poor defense to say, "Oh he was a public officer." The attempted discrimination between a quasi-officer and an employee is purely technical and the city can not escape liability by requiring an employee to take an oath and then calling him an "officer." The real question is not what he is called, but rather what duties he is required to perform, and, in a general way, the duties of the plaintiff were those of a mechanic or workman.

The charter and charter ordinances of the city, the last mentioned ordinances being certain provisions of the charter of 1903, which were repealed as charter provisions, but retained as ordinances, are all the provisions we have technically before us here. They are merely the ground work of the organization of the bureau of fire or fire department of the city, the details of which are evidently worked out in ordinances which are not pleaded by title or otherwise, and were not introduced in evidence. We gather from the briefs, and scraps of oral testimony of witnesses, that there are linemen attached to and under the supervision of the bureau of fire whose duty, as stated in brief of counsel for respondent, is prescribed as follows:

"Linemen shall be subject to all the general rules applicable to the *employees* of the fire bureau; shall be available at all times, either by telephone or signal, for line trouble or other duty, and shall make to the

superintendent of the fire alarm telegraph a daily report of work done and material used upon suitable blanks furnished for that purpose, and they shall check up and file monthly reports of all tools entrusted to their care and perform such other duties as may be assigned.''

From the appellant's brief, we get the following statement of the duties of these linemen:

"A part of the equipment of the bureau of fire of the defendant city, consists of a system of electrical wires, call boxes, bells, and other electrical apparatus, known as the fire alarm telegraph.

"The purpose of this equipment is to transmit fire alarms to fire alarm headquarters in the city hall and therefrom to the fire engine houses located in various parts of the city. The chief officer, known as 'superintendent of fire alarm telegraph' is under the immediate command of the chief of the fire department.

"Under the superintendent of fire alarm telegraph there are three men, one foreman, and two linemen, of the latter of which plaintiff was one. The duties of lineman are in connection with installation and maintenance of the fire alarm telegraph. They are also subject to fire call; they must conform to all the general rules applicable to employees of the bureau of fire; they must be available at all times during the day or night for duty; they are required to answer all second and third alarms at which times they report to the officer in charge and may be assigned to any duty he directs.''

While these matters are not regularly in evidence, the ordinances alluded to not having been pleaded, referred to, or introduced in evidence, still as they were treated by counsel on the trial as in some way being in the case, and as their existence seems to be conceded, we will refer to them as the only available light to be had.

The duties of a lineman seem to be as before stated, principally mechanical and relating to the installation and maintenance of the fire alarm telegraph whereby the different fire stations keep in touch with each other on matters pertaining to the action of the department. They must be ready either day or night for duty, and, while not required to answer the first alarm of fire, they must on the second and third alarms report to the officer in charge and may be assigned to any duty he directs.

Applying the rule of *noscitur a sociis,* this would probably include duties of a character similar to those which form the principal bulk of his labor, but might possibly include actual work with ladder and hose in extinguishing a fire. His work being connected with the fire department, we take it that he might be termed a fireman, although we notice that the witnesses generally refer to them as "lineman." Here crops up a singular phase of this case. The argument of the defendant is that plaintiff is a fireman, and that as a fireman he was required to take an oath, and that, having taken that oath, by virtue of its magical effect, he ceased to be an employee and became an officer. The weakness of this chain of· logic is this, the plaintiff never took or subscribed to any oath. This is conceded by the defendant and is an absolute certainty. According to plaintiff's statement, which is undisputed, he was hired by one Ralph, an officer in the department, to work therein. Whether this hiring was under the stress of an emergency or not, we have no information. At all events, he worked for about a month and took the prescribed civil service examination. He passed the examination, but was never notified that he was appointed, or required to take an oath, and took none,

but continued plugging along at his job just as he had before until the injury occurred. There is no evidence that he was formally appointed, and it is certain that he never took the oath prescribed for regular firemen, and, perhaps, did not know it was necessary. He may have thought that the hiring by Ralph, and his having passed a civil service examination, made him a full-fledged lineman without any further red tape. That such might have been his view seems possible from the following circumstances. There is a pension fund, provided for by the charter and ordinances, supported partly by the city and partly by an assessment for 1 per cent of a fireman's wages, from which, upon his being disabled, is paid the amount of his wages or salary during his disability. The plaintiff, upon his injury, applied for participation in this fund, and for a year recovered the compensation provided and received the sum of $2,200, after which he ceased to draw further. While, under the circumstances, it is doubtful whether he was entitled to it, we take it that it was nothing more than a sort of insurance, and the court solved the problem by directing the jury to deduct the amount so paid plaintiff from any amount of damages which they might find that he had suffered from the injury. So the city lost nothing by having paid him the money, and we are cited to no case to the effect that the acceptance of this sum would have barred him from any other claim that he might have by reason of the negligence of defendant. The taking of the sum would not make the plaintiff an officer of the city, if he were not one already, and when it is claimed, as a defense, that he is technically an officer it is only fair that he should offset one technicality with another and show that he is technically nothing of the kind. However, whether technically a pseudo

officer or not, we hold that he was an employee or worker, within the meaning and intent of the Employers' Liability act, and was entitled to recover.

There are many phases of this case which it would be a pleasure, and especially it might be profitable, to discuss and distinguish between the authorities cited by counsel on both sides, which have all been read and considered; but, as this opinion has already been necessarily prolonged beyond the usual length, we forego further discussion.

The judgment is affirmed.

Coshow, C. J., and Rand and Rossman, JJ., concur.