Argued February 27; reversed April 22; rehearing denied
May 20, 1941

## WOLD *v.* CITY OF PORTLAND

(112 P. (2d) 469)

Before Kelly, Chief Justice, and Belt, Bailey, Lusk, Rand and Rossman, Associate Justices.

*L. E. Latourette*, City Attorney, and *John B. Seabrook*, Deputy City Attorney, both of Portland, for appellant.

*Arthur I. Moulton*, of Portland (Moulton & Davis, of Portland, on the brief), for respondent.

BAILEY, J. This action was brought by the plaintiff, Harriet Wold, against the City of Portland, a municipal corporation, to recover damages suffered by her through injury to her health, growing out of her employment by the City of Portland in its motor vehicle inspecting station. From a judgment in favor of the plaintiff the defendant has appealed.

Chapter 420, Oregon Laws 1935 (§§ 95-3001 and 95-3002, O. C. L. A.), confers upon cities having a popu-

lation of one hundred thousand or more inhabitants authority to provide by ordinance for periodical inspection of motor vehicles used on the streets of such cities, to require motor vehicles to be submitted for inspection, to prohibit the use on the streets of such cities of motor vehicles that fail to comply with requirements of the state laws, to impose reasonable fees to cover the cost of inspection, and otherwise to enforce the provisions of such ordinance and provide penalties for its violation. It is stated in the first section of that chapter that "the purpose of any such inspection and demonstration shall be to ascertain whether such vehicle complies with the laws of this state."

Pursuant to that enactment, the City of Portland on November 14, 1935, passed ordinance No. 67,631 entitled, "An ordinance providing for the inspection of motor vehicles and providing a penalty". Section 2 of the ordinance authorizes the bureau of municipal shops to establish a station for testing motor vehicles used on the city streets and "To provide such mechanical devices and equipment at such station or stations as shall be sufficient to make, with precision, lawful tests of motor vehicles; to conduct the test of motor vehicles as by the motor vehicle laws of the state of Oregon authorized, and prepare and furnish certificates or tags to be attached to motor vehicles inspected which successfully pass the test of safety required by the law."

Section 11 of the ordinance provides that:

"The inspection of motor vehicles shall include the inspecting and testing of brakes, lights, signaling devices, windshield wipers, rear vision mirrors, reflectors, steering mechanism, wheel alignment and tires, mufflers, exhaust system, draw bars, fifth wheels and tow-

ing devices, and such other safety factors and/or other factors and requirements of city and state laws as may enable the bureau of municipal shops to determine that each motor vehicle inspected is safe for operation on the streets of the city.''

Section 13 of the ordinance provides that upon issuing a seal or certificate showing satisfactory passing of inspection a fee of fifty cents shall be collected, ''which shall be credited . . . to an account of the general fund to be known as the 'motor vehicle inspection fund,' and said fund may be used to defray the expenses of the bureau of municipal shops in the performance of said tests. Any additional expenses necessary in carrying out the provisions of this ordinance shall be made available from such source and in such manner as shall be determined by the council from time to time.''

Section 14 of the ordinance prescribes the tests to be applied, and section 15 provides a penalty for violation of the ordinance.

In order to perform the inspection required by the ordinance, plans were prepared for and approved by the City of Portland, from which was constructed a building 160 feet long, 73½ feet wide and 25 feet high, at the northeast corner of Southeast Powell boulevard and Milwaukie street. There are five driveways leading lengthwise through the building. The opening at each end of four of the driveways is nine by fourteen feet in size, and at both ends of the fifth driveway the opening is eleven by fourteen feet. All these entrances and exits remain open at all times. On the east and west sides of the building are many adjustable windows which may be opened and closed at any time. There are numerous fresh-air vents in the ceiling and

floor, and an electrically-powered ventilating system was installed for removing gases and fumes created by motor vehicles.

Between the driveways are platforms for the use of inspectors and others. Along each driveway within the building is placed apparatus for making tests of alignment, brakes and lights. Between two driveways, at the north or exit end of the building, is a small booth used by the cashier, who receives the fees for testing and issues inspection certificates. At the northeast corner of the building is attached an addition, in which there are two offices, one for the inspectors and the other used in keeping books and records of the activities of the testing station.

The plaintiff was first employed by the city as a ledger clerk under civil service regulations, in May, 1933. She was then forty-three years of age. In October, 1936, because of reduction in the office force, her employment was temporarily discontinued. On December 1, 1936, she was assigned to duty at the motor vehicle testing station. Her services there were performed in the office at the northeast corner of the building, except during lunch time and on other occasions when she relieved the cashier, when she occupied the cashier's booth above mentioned.

Soon after she entered upon employment at the testing station the plaintiff complained that smoke and fumes from the motor vehicles caused her to have headaches and made her ill. She continued to work there until December 31, 1937, since which time she has been absent on account of ill health. At least eight others employed at the inspecting station testified that they had suffered from the injurious effects of gas and fumes from motor vehicles undergoing tests at the

station. The clerk, also a woman, who had served as cashier in the booth from the time the station was opened, testified that up to the time of the trial she had experienced no ill effects from carbon monoxide gas or motor fumes, except that she sometimes had headaches and a bad taste in her mouth.

The grounds on which the plaintiff seeks to recover damages are thus set forth in her complaint:

"During all of said period of time while plaintiff was so employed, defendant caused to be brought into said building, and in close proximity to said office space and quarters where plaintiff was required to work, large numbers of motor vehicles, and in the maintenance of said building and the performance of said work required said motor vehicles to be in operation and the gasoline driven motors thereof to be running within the said building. As defendant well knew, or had it exercised reasonable care in that behalf, would have known, the operation of said gasoline driven motors emitted large quantities of poisonous and noxious gases, and particularly carbon monoxide gas, and the atmosphere of said building was, as defendant well knew or should have known, continually during said period permeated with said noxious and poisonous gases and thereby rendered highly dangerous and extremely deleterious to the health of persons within said building and the office quarters aforesaid, and by reason thereof the work so performed by plaintiff in which defendant was engaged was during all of said time hazardous and dangerous and involved risk and danger to plaintiff as defendant's employe engaged therein.

"During all of said time it was practicable without impairing the efficiency of said building or said work for defendant to have provided quarters for the operation and inspection of said motor vehicles in a well ventilated place removed from said office quarters where plaintiff was required to work, and to have provided a system of ventilation in said office space which

would have prevented any of said gases from coming into said office space, but defendant carelessly and negligently failed to use the care and precaution of providing any such open and ventilated place for the operation of said motor vehicles, or providing any system of ventilation to ventilate either the place where said vehicles were operated or the office space connected therewith, but, on the contrary, during all of said time carelessly and negligently caused and permitted the air and atmosphere of said office space to be continually permeated with said noxious and deleterious gases.

"Wholly as a result of the aforesaid negligence of defendant and its failure to use the care and precautions aforesaid, plaintiff, during the greater portion of said period of time, continued to inhale and breathe the air containing said noxious and deleterious gases, and she was thereby rendered sick and her health and bodily vigor injured and impaired, and she was thereby caused to suffer great physical pain and mental anguish and to be sick in body and mind, and her central nervous system and vital organs, her lungs and heart, have been thereby permanently injured and impaired, and she has been rendered permanently sick in her lungs, heart, and central nervous system, and has thereby been rendered unable to follow her calling as a clerk or to engage in any gainful occupation, and has lost her wages as a clerk since the 1st day of February, 1938, and has incurred large obligations for medical care and treatment, and will be required to incur such obligations in the future; all to her damage in the sum of $25,000.00."

The answer filed by the defendant city describes in detail the building constructed by the City of Portland as an inspection station, and the efforts made by the city to provide proper and sufficient ventilation in order to eliminate the fumes and gases incident to the operation of the testing station.

The defendant further alleges that the plaintiff was not required to do any work involving risk or danger

to her or to the public; that the defendant had used every device, care and precaution that it was practicable to use; and that the plaintiff knew the working conditions existing at the testing plant and assumed such risk, if any there existed.

As a concluding paragraph the answer alleges the following:

"The operation of said testing station is and at all times herein referred to was a governmental activity carried on for the purpose of minimizing accidents by motor vehicles and protecting the lives and limbs of the drivers and of other people, animals and property against damage. The small fee which is charged for such inspection has not covered the cost of providing said activity. Said motor vehicle inspection station was and is at all times referred to herein, set up, maintained and operated under and by virtue of state law and ordinances of the city of Portland passed pursuant thereto, especially ordinance No. 67631", hereinabove described.

The new matter in the answer was put in issue by the reply.

At the close of the evidence the defendant moved for a directed verdict in its favor on the following grounds: (1) that there was no evidence of negligence on the part of the defendant either at common law or under the employers' liability act; (2) that the evidence is conclusive that the plaintiff's injury, if any, was the result of the exercise of a governmental function by the defendant; (3) that the employers' liability act is not applicable, for the reason that the evidence conclusively shows that the plaintiff was not engaged in an occupation involving a risk or danger; also that the plaintiff, from the first day of her employment, had knowledge of the conditions and dangers, if any,

incident to her employment and that therefore she assumed the risk, if any, attending her employment; and (4) that if the employers' liability act is applicable, then the evidence conclusively shows that every practicable device was employed by the defendant to remove the danger of carbon monoxide asphyxia.

██ A municipal corporation has a dual character and consequently it functions in a dual capacity. In one aspect it is governmental, public or legislative; in the other, corporate, proprietary or private: *Blue v. City of Union*, 159 Or. 5, 75 P. (2d) 977; 6 McQuillin on Municipal Corporations, 2d Ed., §§ 2792, 2793. It has become a settled doctrine in this and practically every other jurisdiction in this country that a municipality is not liable for the negligence of its officers and employes when engaged in the performance of governmental or public duties: *Etter v. City of Eugene*, 157 Or. 68, 69 P. (2d) 1061; *Blue v. City of Union*, supra; 6 McQuillin on Municipal Corporations, 2d Ed., § 2792. On the other hand, it is the general rule that when a municipality is proceeding in a private or proprietary capacity it is liable for its torts in like manner as an individual. The reasons for this distinction have been explained in detail in a great many adjudications and it is not here necessary further to enlarge upon them. See, in this connection, *Hagerman v. City of Seattle*, 189 Wash. 694, 66 P. (2d) 1152, 110 A. L. R. 1110; 6 McQuillin on Municipal Corporations, 2d Ed., § 2793.

██ It is not always simple to determine what functions are governmental or public and what private or proprietary. On this question the decisions diverge widely and the various activities of municipalities are differently classified in different jurisdictions. The authorities are agreed, however, that when the undertak-

ing by the city is not for the promotion of its own private interests as a corporate entity but for the public good, such undertaking is governmental: *Etter v. City of Eugene*, supra; 6 McQuillin on Municipal Corporations, 2d Ed., § 2793; *Hagerman v. City of Seattle*, supra; *Watkins v. City of Toccoa*, 55 Ga. App. 8, 189 S. E. 270.

■ In the instant case the city of Portland in conducting the station for inspecting motor vehicles was acting as the agent of the state and in the public interest: *Evanston v. Wazau*, 364 Ill. 198, 4 N. E. (2d) 78, 106 A. L. R. 789; *Martin v. Rowlett*, 185 Okl. 431, 93 P. (2d) 1090; *Mayer v. Ames*, 133 Ohio S. 458, 14 N. E. (2d) 617; *Watkins v. City of Toccoa*, supra; *Hagerman v. City of Seattle*, supra; *Imes v. City of Fremont*, 58 Ohio App. 335, 16 N. E. (2d) 584.

In *Evanston v. Wazau*, supra, an ordinance practically identical with the one here involved was passed by the city of Evanston pursuant to statutory authority, providing for the inspection of motor vehicles. It was there held in an attack upon the constitutionality of the measure that the ordinance had been enacted under the police power of the state and was intended to promote the safety and welfare of the public. *Martin v. Rowlett*, supra, involved the constitutionality of a city ordinance requiring the periodical inspection of motor vehicles. It was therein held that the ordinance was unconstitutional on the ground that it conflicted with a state statute which limited the power of cities to regulate motor vehicles. That such inspection was within the police power of the state and by proper legislation could have been conferred upon the city was recognized by the court.

It is said in a concurring opinion by Mr. Justice Gorman in *Mayer v. Ames*, supra, that:

"In order to be assured that the laws pertaining to mechanical equipment are observed, the legislature is not limited in the exercise of its police power to the punishment of infractions of the law, but has the right to require periodical inspections of vehicles. This power of inspection coupled with the charging of a fee for the service has long been an attribute of the police power."

■ The fact that the city was authorized by the state, but was not required, to establish and operate stations for testing motor vehicles, does not preclude that activity of the city from being a governmental function: *Nicholson v. City of Detroit*, 129 Mich. 246, 88 N. W. 695, 56 L. R. A. 601; *Gebhardt v. Village of LaGrange Park*, 354 Ill. 234, 188 N. E. 372; *Krueger v. Board of Education*, 310 Mo. 239, 274 S. W. 811, 40 A. L. R. 1086; *City of Dallas v. Smith*, 130 Tex. 225 107 S. W. (2d) 872; *Gartman v. City of McAllen*, 130 Tex. 237, 107 S. W. (2d) 879; *Mokovich v. School District*, 177 Minn. 446, 225 N. W. 292.

By legislative enactment, all motor vehicles operated on the streets and highways of the state of Oregon are required to conform to certain standards of condition and equipment: §§ 115-367 to 115-381, both inclusive, O. C. L. A. This regulation is an exercise of the police power of the state, and the City of Portland, in passing and enforcing its ordinance No. 67,631, *supra*, was acting as the agent of the state in the enforcement of statutory requirements affecting motor vehicles. "The power thus delegated to cities remains after its delegation police power, and being such, it is essentially governmental, police power being defined as 'a grant

of authority from the people to their governmental agents for the protection of the health, the safety, the comfort and the welfare of the public' ": *City of Dallas v. Smith*, supra. The employes of the City of Portland, including the plaintiff, who were engaged in carrying out any part of the duty imposed by that ordinance were engaged in performing a public and governmental function and were not working for the city in its private capacity: *Long v. Birmingham*, 161 Ala. 427, 49 So. 881, 18 Ann. Cas. 507.

■ A fee of fifty cents is fixed by the ordinance to be charged for the inspection of each motor vehicle that successfully passes the tests. The fees so collected are insufficient to cover the cost of inspection. In making provision for meeting the deficit, the ordinance clearly shows that this function of the city is not contemplated as a source of revenue. The charging of a fee does not make of a governmental activity one that is private or proprietary when it is not primarily undertaken for profit: *Imes v. City of Fremont*, supra; *City of Atlanta v. Garner*, 56 Ga. App. 435, 192 S. E. 841; *Watkins v. City of Toccoa*, supra; *City of Dallas v. Smith*, supra; *Gebhardt v. Village of LaGrange Park*, supra; *Mocha v. City of Cedar Rapids*, 204 Iowa 51, 214 N. W. 587; *Johnson v. Board of Road Commissioners*, 253 Mich. 465, 235 N. W. 221.

■ The plaintiff asserts that the employers' liability act applies to the negligence of officers and employes of municipal corporations while engaged in performing either governmental or corporate functions. *Mackay v. Commission of Port of Toledo*, 77 Or. 611, 162 P. 250, and *Asher v. City of Portland*, 133 Or. 41, 284 P. 586, are cited in support of that contention.

In the Mackay case the plaintiff was employed by the defendant on a dredger operated by the defendant in deepening rivers and bays in the vicinity of the port of Toledo. He was ordered to procure water for filling a boiler and in doing so fell from a worn and defective ladder and was injured. It was therein held, largely based on the case of *Wagner v. City of Portland*, 40 Or. 389, 60 P. 985, 67 P. 300, that the work in which the plaintiff was engaged was corporate or private and not governmental. With reference to the applicability of the employers' liability act, the court observed:

"It seems clear to us, however, that if it is amenable to a common-law liability, as is held in the cases cited, it must logically follow that it is liable under a statute so comprehensive in its scope as the one to which reference is made."

The plaintiff in the case of *Wagner v. City of Portland*, supra, was injured while employed in keeping the fire alarm system of the city in order. This court therein classified the work done by the plaintiff as "performed through the instrumentality of private or corporate agencies, and not through the fire department or its officers, or through officers of the city whose duty it was to perform such work."

In *Asher v. City of Portland*, supra, the plaintiff was employed "in the work of clearing obstructions to the approaches of" Ross Island bridge in the city of Portland. Among the obstructions was an "old and then unused line of telephone poles with wires attached, which had at one time been used by the city as an adjunct to its fire alarm system". The plaintiff, after he was assured by the foreman that a certain pole was safe, "climbed it and was engaged in the labor of removing the cross-arms and wires" when the pole broke

at the base and he was injured. In holding that the plaintiff was entitled to recover and that the employers' liability act applied, this court said:

"Taking down the pole had little if any more relation to his duty as a fireman, if indeed he was a fireman, than clearing the brush out of a proposed street, or cutting down a tree that might be in the way of the proposed improvement. In either case, it would be doing work which the city was carrying on ministerially, and not governmentally, unless we should overrule the case before cited [Giaconi v. City of Astoria, 60 Or. 12, 113 P. 855, 118 P. 180, 37 L. R. A. (N. S.) 1150], which we do not feel inclined to do."

The plaintiff in the case at bar avers that the duties which she was performing were ministerial and not governmental. The courts, however, in discussing injuries to employes engaged in discharging duties required by a municipality in its ministerial capacity, treat such dutes as connected with the corporate or private functions of the municipal corporation and not its public and governmental activities: *Asher v. City of Portland,* supra; *Wagner v. City of Portland,* supra; *Mackay v. Commission of Port of Toledo,* supra; *Lupke v. School District No. 1,* 130 Or. 409, 275 P. 686; *Broome v. City of Charlotte,* 208 N. C. 729, 182 S. E. 325; *City of Richmond v. Virginia Bonded Warehouse Corporation,* 148 Va. 60, 138 S. E. 503, 54 A. L. R. 1485.

We can not believe that the people of the state of Oregon in initiating and enacting the employers' liability act, chapter 3, Laws 1911 (§§ 102-1601 to 102-1606, both inclusive, O. C. L. A.), intended to abolish the immunity of a municipal corporation from liability for the negligence of its officers and employes while performing governmental functions. In *Rapp v. Multnomah County,* 77 Or. 607, 152 P. 243, it was argued that

the employers' liability act gave an injured employe a right of action against the county for the negligence of its officers in not providing the employe a safe place in which to work. After pointing out that the counties of the state are mere instrumentalities of the state in the exercise of its sovereignty, this court said:

"Public policy forbids that the state shall be made a defendant in litigation without its consent, and as counties are regarded as parts of the government the exemption is in good reason also extended to them, unless a statute exists expressly allowing the maintenance of actions against them. The right of action can not be grounded upon mere implication. The state does not promulgate its own laws against itself or against its governmental subordinates, unless it is so directly declared by the legislative power of the state. A statute imposing a new liability, where otherwise none would exist, must be construed strictly".

See also, in this connection: *Gearin v. Marion County*, 110 Or. 390, 393, 223 P. 929; *Smith's Administrator v. Commissioners*, 146 Ky. 562, 143 S. W. 3, 38 L. R. A. (N. S.) 151; *Long v. Birmingham*, supra; 25 R. C. L. 1056, § 281.

In the case before us the circuit court ruled that the employers' liability act was not applicable to the facts shown, and submitted the cause to the jury on the question of whether there was common-law negligence on the part of the defendant. The court's conclusion that the employers' liability act did not apply seems to have been based on the theory that the plaintiff, when she received the injuries complained of, was not engaged in a hazardous occupation. As hereinabove pointed out, the employers' liability act is not applicable to a municipality in relation to its governmental functions, nor is a city liable for common-law negli-

gence in respect to the discharge of its governmental duties.

■ The plaintiff argues that if it should be held that the defendant is not liable either for common-law negligence or under the employers' liability act, the judgment appealed from should nevertheless be affirmed on the ground that the city was guilty of maintaining a nuisance and that the plaintiff's injuries were caused by such nuisance. The nuisance theory seems to be an afterthought. The complaint alleges that the defendant carelessly and negligently failed to use the care and precaution of providing a proper ventilating system and carelessly and negligently caused and permitted the air and atmosphere of the office in which the plaintiff was employed "to be continually permeated" with noxious and deleterious gases. It then alleges that, "Wholly as the result of the aforesaid negligence of defendant and its failure to use the care and precautions aforesaid," the plaintiff continued to inhale and breathe the air containing noxious gases and was thereby rendered ill. The plaintiff bases her claim for damages on the theory that her injuries were due to the negligent and careless manner in which the inspection of motor vehicles was conducted, and not on the ground that such injuries were due to the defendant's creation and maintenance of a nuisance. The pleadings "declare and control the issues to be determined and the relations that the parties bear to each other": *Warner v. Synnes*, 114 Or. 451, 459, 230 P. 362, 235 P. 305, 44 A. L. R. 904.

As was said in *Pearson v. Kansas City*, 331 Mo. 885, 55 S. W. (2d) 485, "Respondent, having based her petition upon negligence (failure to furnish safe place to work and safe appliances with which to work), could

not recover on the theory of nuisance." See also, *Davis v. Cities Service Oil Company,* (Mo. App.) 131 S. W. (2d) 865. Inasmuch as the action before us was tried on the theory of negligence and not nuisance, the plaintiff's contention that the judgment should be affirmed on the latter ground must be disregarded.

The judgment appealed from is reversed and the cause remanded to the circuit court with instruction to enter judgment in favor of the defendant.